## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

TRACEY FURISTER,

      *Plaintiff*,            CASE NO. 16-10454

*v.*                        MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

      *Defendant*.

_____/

## MAGISTRATE JUDGE'S OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 19, 22)

### A.    Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq*. (Doc. 4; Tr. 1-3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 19, 22). The case was reassigned from District Judge Gerald Rosen to District Judge Mark Goldsmith on December 27, 2016, pursuant to the retirement of Judge Rosen. On April 20, 2017, Judge Goldsmith ordered the parties to "discuss whether they are willing to consent, under 28 U.S.C. § 636(c), to conducting all further proceedings in this case before the assigned Magistrate Judge." (Doc. 24). If the parties did not so consent, they were required to file "a joint notice, within two weeks of the date of [that] order, advising the Court that the parties do not consent." (*Id*.). If they did consent, the Commissioner was instructed to "file a fully executed Notice, Consent and Reference of a Civil Action to a Magistrate Judge

form," and was to perform this action "within two weeks of the date of this order." (*Id*.). The matter was not stayed pending the parties' decision on whether to consent. On January 31, 2017, the undersigned magistrate judge issued a report and recommendation to grant Furister's motion for summary judgment. (Doc. 25). Later that day, the Commissioner filed a notice of consent to magistrate judge jurisdiction bearing signatures from both parties. (Doc. 26). On February 7, 2017, District Judge Goldsmith filed an order instructing that "[i]n light of the parties' consent, the Court orders that the matter is deemed to be before the Magistrate Judge for entry of final judgment." (Doc. 27). The consent form was signed by District Judge Goldsmith on February 7, 2017. (Doc. 28). With consent to conduct all proceedings in this matter, including the entry of final judgment, I therefore now convert my earlier report and recommendation into an opinion an order.

Plaintiff Tracey Furister was forty-one years old as of February 17, 2015, the date of the ALJ's decision. (Tr. 29, 189). Her application for benefits was initially denied on April 15, 2013. (Tr. 63). Furister requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ Andrew Sloss on September 26, 2014. (Tr. 40-52). Furister, represented by attorney Aaron Lemmens, testified, as did vocational expert ("VE") Edwards. (*Id*.). A second hearing was held on January 9, 2015, to permit Furister to question the VE regarding supplemental interrogatories sent to that expert. (Tr. 35-39). At the second hearing, Furister was represented by attorney Lunitz, and VE Everetts testified. (*Id*.). On February 17, 2015, the ALJ issued a written decision in which he found Furister not disabled. (Tr. 18-29). On December 9, 2015, the Appeals Council denied

2

review. (Tr. 1-3). Furister filed for judicial review of that final decision on February 8, 2016. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

3

Under the Act, "DIB and SSI are available only for those who have a 'disability.'"

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The

Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

4

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least 18 years old and has a disability that began before age 22 (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Furister not disabled under the Act. (Tr. 29). The ALJ found at Step One that Furister had not engaged in

5

substantial gainful activity following the alleged onset date, January 15, 2013. (Tr. 20). At Step Two, the ALJ concluded that Furister had the following severe impairments: "chronic obstructive pulmonary disease (COPD) and degenerative disc disease." (Tr. 20-22). At Step Three, the ALJ found that Furister's combination of impairments did not meet or equal one of the listed impairments. (Tr. 22). The ALJ then found that Furister had the residual functional capacity ("RFC") to perform sedentary work, except with the following additional limitations:

> [She] can frequently climb ramps or stairs and balance. However, the claimant must avoid concentrated exposure to vibration, respiratory irritants and hazards.

(Tr. 22-27). At Step Four, the ALJ found that Furister could not return to any past relevant work. (Tr. 28). At Step Five, the ALJ concluded that Furister retained the ability to perform work which exists in significant numbers in the national economy. (Tr. 28-29).

### E.    Administrative Record

#### 1.    Medical Evidence

The Court has thoroughly reviewed Furister's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.    Application Reports and Administrative Hearing

##### a.    Furister's Function Report

Furister completed a function report on March 5, 2013. (Tr. 233-40). Furister writes in difficult to decipher cursive script, thus the Court will do its best to determine her

6

meaning. Furister wrote that she was disabled by pain, COPD, heart disease, and numbness in the legs. (Tr. 233). She took care of her thirteen year old son and had pets, but received assistance from her roommate. (Tr. 234). Her sleep was interrupted by pain. (*Id*.). She had some difficult bathing, caring for her hair, and shaving. (*Id*.). She did not require reminders to perform personal care or take medicine. (Tr. 235). She prepared "quick & easy" meals daily. (*Id*.). She did not perform yard work or housework. (*Id*.). She could drive a car, shopped in stores monthly, and could handle money. (Tr. 236). Her hobbies included sewing on a monthly basis. (Tr. 237). She spent time with others occasionally. (*Id*.). She wrote of problems performing all postural and exertional activities, but did not report mental issues, including remembering, concentrating, understanding, or getting along with others. (Tr. 238). She could follow instructions and get along with others in an "ok" fashion. (Tr. 239). As to assistive devices, she wrote that she used "oxygen" "all the time," but did not note the use of any walking aid. (*Id*.). Finally, she drafted a long list of medicines, but did not list any side effects of these medications. (Tr. 239-40).

### b.     Furister's Testimony at the First Administrative Hearing

Furister testified at the September 26, 2014, hearing that she was prevented from working by degenerative disc disease, bone loss in the spine, spinal stenosis, and narrowing of the spinal canal. (Tr. 44). Her "lumbars one and two have fused together." (*Id*.). She required "spinal fusion" surgery, which promised to relieve her pain to some degree. (*Id*.). She was in pain "24/7," and was unable to bend. (*Id*.). Her pain was caused by a car accident many years prior, but the pain began deteriorating in the four years prior. (*Id*.). Furister

7

asserted that the use of medication, physical therapy, injections, and a TENS unit were ineffective. (*Id.*).

Furister wore "oxygen at nighttime" due to labored breathing brought on by COPD. (*Id.*). She ceased smoking four months prior to the hearing, and used inhalers daily. (Tr. 45).

Furister had a heart stent and "needed another one." (Tr. 45). She also suffered from hepatitis C, and suffered from medication side effects which "make you really sick." (*Id.*). She could cook, stand, and do dishes if she did them "in intervals." (Tr. 46). She did not lift over five pounds. (*Id.*). Furister relied on her daughter to do laundry, vacuum, and mop the floor. (*Id.*).

Furister spent her days getting her son ready for school, sitting, performing tasks around the house, exercising, and assisting her son with homework. (Tr. 46). As to exercise, she used a rubber band to stretch her legs and strengthen her muscles in order to improve her spine. (*Id.*).

Furister asserted that she was prescribed a walker by her physician to prevent falls when her back "goes out." (Tr. 46-47). She discussed experiencing better and worse days, with her worse days involving shooting pain that occurred during simple tasks like putting on shoes. (Tr. 47). This pain was significant enough to prevent her from moving; the pain happened "quite frequently." (*Id.*). This pain persevered despite her usual regimen of strong medication. (*Id.*). She lied down on the couch and propped up her legs daily, which relieved her back pain to some degree. (Tr. 48). The pain radiated from her back into her legs; she

8

no longer has "any reflexes in [her] feet." (*Id.*). This impacted her balance, and resulted in falls "[a]ll the time," particularly first thing in the morning. (*Id.*). Her "energy level" was at a "five, six," because she desired "to do more things, but can't." (*Id.*). She got three to four hours of uninterrupted sleep per night. (Tr. 49).

Furister was unable to sit still for more than twenty minutes at a time, and could stand for fifteen minutes. (Tr. 49-50).

### c.      The VE's Testimony at the First Administrative Hearing

The ALJ then called upon the services of a VE to determine Furister's ability to perform work. (Tr. 58). The ALJ then asked several questions regarding Furister's past work, but these questions are not relevant as the ALJ found that Furister was unable to perform any past work, and thus based his unfavorable decision on Furister's ability to complete other work available in the national economy. (Tr. 28, 59). The ALJ asked the VE to assume a hypothetical individual with Furister's age, education, and work experience, and who could perform light work with the following additional limitations:

> Can only frequently climb ramps or stairs and balance, and must . . . avoid concentrated exposure to vibration, respiratory irritants, and hazards.

(Tr. 51). The VE responded that Furister could perform her past relevant work as a newspaper delivery person, but once again this finding is irrelevant because the ALJ's analysis proceeded to Step Five of the sequential evaluation process. (Tr. 28).

Furister's attorney then asked what percentage of time an employee could be off task before their distraction became work preclusive; fifteen percent, answered the VE. (Tr.

51-52). Furister's attorney also asked whether a worker who was required to "lay down and elevate her feet at intermittent and unexpected times throughout the day" would be able to perform work; the VE found such a restriction would be work-preclusive. (Tr. 52).

Puzzlingly, the VE did not testify as to jobs which a hypothetical individual experiencing Furister's limitations could perform. However, VE Everts appears to have produced a "Vocational Interrogatory" in March 2012, in which she presented written testimony. (Tr. 257-60). Specifically, she addressed a hypothetical in which a worker with Furister's education, age, and experience, would be limited to sedentary work, but who could "frequently climb ramps or stairs and balance" and who "must avoid concentrated exposure to vibration, respiratory irritants, and hazards." (Tr. 258). Everts concluded that a so-limited individual could not perform any of Furister's past work, but could perform work as a packer (70,000 jobs nationally), information clerk (85,000 jobs), and inspector (13,000 jobs). (Tr. 259). Furister's attorney did not challenge the lack of testimony on jobs available in the national economy at the oral hearing, and Furister does not argue in her brief that the ALJ's decision is lacking support from the VE's testimony. Furister has thus waived whatever arguments she could have raised, if any, with regard to this lack of testimony at the oral hearing. *See Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir. 2006).

### d.     The VE's Testimony at the Second Administrative Hearing

A second administrative hearing was held on January 9, 2015. (Tr. 37). Furister's attorney asserted that a worker who was found disabled by their physician would be unable

10

to perform work; the ALJ agreed.[1] (*Id.*). Her attorney then asked whether the jobs identified by the VE, *i.e.* packer, information clerk, and inspector, would require a worker to be on task for a minimum percentage of the workday; the VE confirmed that employers tolerate no more than fifteen percent time off task. (Tr. 38). Finally, the VE confirmed that employers generally permit no more than one absence per month following a probationary period. (*Id.*).

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both    "acceptable"    and    non-acceptable sources provide evidence to the Commissioner, often in the form of opinions

---

[1] Both Furister's attorney and the VE are incorrect on this point. The question of disability is reserved to the Commissioner, thus a physician's finding that a claimant is disabled does not render the claimant disabled. *See* 20 C.F.R. § 404.1527(d).

"about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions

12

entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Furister v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record

13

and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Furister v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a).

14

Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;
(ii)   The location, duration, frequency, and intensity of . . . pain;
(iii)  Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)    Treatment, other than medication, . . . received for relief of . . . pain;
(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir.

15

1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.   Analysis

Furister argues that the ALJ erred in several ways, each of which should merit remand. (Doc. 19 at 14-22). These arguments will be addressed in turn.

### 1.   The ALJ Adequately Addressed Dr. Kudray's Opinion

Furister first argues that the ALJ gave insufficient weight to the opinion of her treating physician, Dr. Kudray. (Doc. 19 at 14-17). In December 2012 Dr. Kudray issued a check-the-box opinion providing that Furister could not work, could stand or walk less than two hours per eight hour workday, could sit for a full workday, and could occasionally lift less than ten pounds. (Tr. 745-46). Furister argues that the reasons provided by the ALJ for discounting Dr. Kudray's opinion do not degrade the value of the opinion. (*Id.* at 15-16). As quoted by Furister, the ALJ concluded as follows:

> The claimant uses a walker for balance and weakness (Ex. 18F, p. 7). The record also reveals that the claimant is on home oxygen due to desaturation at night (Ex. 4F, p. 25). However, the records provided by Dr. Rao and Dr. DeNardo do not suggest evidence of an acute respiratory condition (Ex. 4F, p. 106; 11F, p. 16F [sic], p. 71, 21F and 23F, p. 1). More recent treatment records provided by Dr. Rao in October of 2014 indicate that pulmonary function tests conducted at that time reveal "only mild obstructive airway disease" (Ex. 23F, p. 1). Dr. Rao notes a diagnosis of mild obstructive airway disease, COPD, and possibly mild asthma. Dr. Rao regarded the claimant's pulmonary status as slightly limited, but stable at that time. Furthermore, Dr. Rao notes that the claimant was "working hard to quit smoking" and that this seemed to be helping her respiratory status (Ex. 23F, p. 1). After reviewing the medical evidence of record, the undersigned has accorded little weight to the assessments by Dr. Reddy[1], as they are not consistent with the medical evidence of record. (Tr 27)

16

(*Id.* at 16, Tr. 27). Furister asserts that this reasoning challenges Dr. Kudray's opinion only insofar as it relates to breathing issues, but does not challenge Dr. Kudray's findings regarding back pain and ambulation. (Doc. 19 at 16-17). Furister concludes that the ALJ did not provide good reasons for discounting the other portions of Dr. Kudray's opinion, and therefore the ALJ's analysis is faulty. (*Id.*).

The Commissioner counters that the ALJ's discussion of breathing issues was not part of his analysis of Dr. Kudray's opinion. (Doc. 22 at 13). Instead, the Commissioner asserts that the ALJ sufficiently explained the weight given to that physician's opinion by noting that the opinion was not sufficiently well supported by the evidence. (*Id.* at 14). This analysis provides little explanation as to what inconsistencies the ALJ perceived between the opinion and the other medical evidence of record.

The Commissioner also raises several post-hoc reasons for according little weight to Dr. Kudray's opinion, including that they physician was not a specialist in the area of lumbar pain, and that the physician's opinion was of the check-the-box variety. (*Id.*). Furister complains that these post-hoc rationalizations ought not be considered, because it is the ALJ's reasoning alone which is under review. She is correct that the ALJ's arguments must stand on their own, and that the Commissioner may not create out of whole cloth arguments which the ALJ did not produce. *See Hairston v. Astrue*, No. 11-14974, 2013 WL 1296867, at *4 (E.D. Mich. Mar. 30, 2013). Yet it is equally true that an ALJ's error in considering an opinion is harmless where the "treating source's opinion is so patently

17

deficient that the Commissioner could not possibly credit it." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

The Sixth Circuit has found that "check-the-box" opinions, unaccompanied by explanation, are entitled to little or no weight, because "it is nearly impossible to analyze" the justification for the checked boxes. *See Hernandez v. Comm'r of Soc. Sec.*, 644 Fed. Appx. 468, 474 (6th Cir. 2016); *see also Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) ("Although by itself a check-box form might be weak evidence, the form takes on greater significance when it is supported by medical records."). Several decisions in this circuit have found that an ALJ's failure to explain the weight given to a physician's check-the-box opinion is harmless error. *See Denham v. Comm'r of Soc. Sec.*, No. 2:15-CV-2425, 2016 WL 4500713, at *3 (S.D. Ohio Aug. 29, 2016) ("The magistrate judge also correctly found that any error in the ALJ's consideration of Lewis's evaluation was harmless because the check-box form was so patently deficient that the Commissioner could not possibly credit it.); *see also Perryman v. Colvin, No. 3:15-00604, 2016 WL 4993384*, at *4 (M.D. Tenn. Sept. 19, 2016), report and recommendation adopted sub nom. *RACHEL BIANCA PERRYMAN, Plaintiff, v. SOCIAL SECURITY ADMINISTRATION, Defendant.*, No. 3:15-CV-00604, 2017 WL 119544 (M.D. Tenn. Jan. 11, 2017); *Irizarry v. Colvin*, No. 1:13-CV-02161, 2014 WL 6879117, at *12 (N.D. Ohio Dec. 4, 2014); *but see Jones v. Comm'r of Soc. Sec. Admin.*, No. 5:13-CV-02087, 2014 WL 4715727, at *9 (N.D. Ohio Sept. 22, 2014) (questioning whether a "a check box form is patently deficient such that an ALJ is

18

not required to consider or discuss the opinion"). In this case, the ALJ did not ignore Dr. Kudray's opinion, but merely gave it consideration that such an unsupported, conclusory opinion merits. Insofar as the ALJ's brief treatment of Dr. Kudray and Dr. Reddy's opinions can be considered error, that error was harmless because the opinion is patently deficient.

### 2.     The ALJ Failed to Account for Furister's Use of a Walker

Furister next argues that the ALJ's RFC did not properly account for her use of a walker, an assistive device prescribed by Dr. Reddy. (Doc. 19 at 15-17). The ALJ recited in his decision some of the medical findings made during Furister's treatment sessions, including that she was "able to ambulate without an assistive device," and was "independent with most of the activities of daily living." (Tr. 24). The Commissioner also notes that "even after Dr. Reddy recommended use of a walker, the doctor's treatment notes consistently indicated Plaintiff was able to ambulate without assistance and was able to perform activities of daily living independently. *See* (Tr. 677-708)." (Doc. 22 at 16).

The ALJ's assertion that Furister was "consistently" found able to ambulate without assistance is something more than a stretch, and indeed appears to be a mischaracterization of the evidence. The physicians in the records cited do not "regularly" find that Furister was able to ambulate without difficulty, and indeed suggest the inverse. On January 16, 2014, Dr. Reddy recommended the use of a walker. (Tr. 682). On April 17, 2014, Dr. Reddy wrote under "Functional History" that "[p]atient is able to ambulate without an assistive device. Independent with most of the ADLS [sic]." (Tr. 690). Yet in that same treatment

19

record, Dr. Reddy noted that Furister ambulated "slowly," suffered from antalgic gait, "[r]ecommended [p]atient to have a wheeled walker due to gait difficulty and history of falls," and wrote that Furister should follow-up with a neurosurgeon. (Tr. 690-91). These notes are susceptible to multiple interpretations.

The Commissioner appears to read Dr. Reddy's "functional history" finding as contradictory to his findings regarding gait and the necessity for a walker. Yet a more plausible reading of these records is evident. Because Dr. Reddy wrote that Furister could ambulate without difficulty in the "functional history" section of his notes, this more likely represents a finding regarding Furister's condition prior to the recommendation of a walker. The ALJ's finding that this note was produced pursuant to "[a] physical examination performed at that time," *i.e.* on the date of the January 16, 2014, treatment session, is therefore not supported by the evidence. (Tr. 24).

Dr. Reddy's August 21, 2014, note includes a duplicated finding in the "functional history" section that Furister could "ambulate without an assistive device," but includes a finding in the "history" section that Furister "states she has difficulty walking and needs a gait aid," and noted in the "assessment" section that she had "[g]ait difficulty" and "[h]istory of falls." (Tr. 706-08). Rather than concluding that these notes were self-contradictory, or that Furister's use of a walker was self-imposed, neither of which is supported by the record, I find that the notes regarding her ability to "ambulate without difficulty" represent a historical recitation of Furister's earlier state of health, prior to the need for a walker.

The above reading is supported by the other evidence of record. In January 2014 Furister underwent an epidural pain relieving injection. (Tr. 684). She also received an injection in February 2014. (Tr. 686). In March 2014 it was noted that Furister received no benefit from the injections, and that her pain was worsening. (Tr. 688). In May 2014 Dr. Reddy wrote that Furister's pain was aggravated by most activities, that she suffered from bilateral weakness in the lower extremities, sometimes required help from her husband to stand up, was "[t]hinly built," appeared "sickly," and made use of her walker during the treatment session. (Tr. 700). Furister's gait was normal with use of the walker, she experienced little relief from epidural injections, was unable to complete physical therapy due to pain, and she was instructed to report to a neurosurgeon if she quit smoking. (*Id.*).

The records cited by the Commissioner thus seem to suggest that the condition of Furister's spine worsened over time, that she required the use of a walker to ambulate, that she received little benefit from the conservative therapy[2] of injections, that she was unable to participate in physical therapy, and that surgery was indicated if and when she could quit smoking. Insofar as these records contain notation that Furister could ambulate without restriction and perform her activities of daily living without restriction, those appear to be historical records of her prior condition, not an updated depiction of her worsening spinal impairments. Furister's function report was completed prior to the prescription of a walker,

---

[2] The ALJ asserts that Furister's spine condition has "been treated with conservative pain management measures, such as pain medication and injection therapy." (Tr. 23). This characterization is more than a little misleading. As noted, Furister was repeatedly recommended to surgeons, and surgery was recommended, but was prevented by her smoking habit. (Tr. 690-91, 739, 745).

but her testimony at the September 2014 oral hearing tends to confirm the need for a walker. (Tr. 46-47). As noted by the ALJ, she made use of the walker at the hearing. (Tr. 46). The ALJ cited no viable reason to doubt Furister's need for a wheeled walker, and all evidence in the record seems to confirm that one was both necessary and used following Dr. Reddy prescribing one in January 2014.

Because all evidence points to Furister's need for a walker, the ALJ was required to account for that limitation in his RFC finding. *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002) (holding that the RFC must "accurately reflect" the abilities of the claimant); *Dow v. Comm'r of Soc. Sec.*, No. 1:13CV493, 2014 WL 4377820, at *5 (S.D. Ohio Sept. 4, 2014) ("Where the use of a walker is part of the record, the ALJ is obligated to consider whether this factor would have an impact on the plaintiff's RFC.").

The Commissioner also argues that Dr. Reddy's prescription of a walker was not a medical opinion at all, because that physician did not opine on the restrictions which would result from the use of a walker, and because Dr. Reddy's single-sentence opinion that Furister was disabled did not include reference to a walker. (Doc. 22 at 16). This is true, but irrelevant. *See* 20 C.F.R. § 416.927(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."). The ALJ was obligated to craft an RFC finding which adequately accounted for her supportable limitations. *See* 20 C.F.R. § 404.1545(a)(2) (defining the RFC as "the

22

most he [or she] can still do despite his [or her] limitations," and noting that it should be based on "all the relevant evidence in [the] case record."). Consequently, regardless of whether the prescription of a walker occurred in an opinion or in mere treatment notes, the ALJ was required to incorporate that limitation into the RFC.

That Furister's use of a walker was not explicitly discussed in Dr. Kudray's December 2014 or Dr. Reddy's November 2014 opinion is not surprising. Dr. Kudray's opinion contains only scant hand-written notes regarding Furister's condition related to her diagnoses, including chronic lower back pain, radiculopathy, and the need for spinal surgery. (Tr. 745). The remainder of the opinion is composed of ticked boxed, indicating that Furister could only occasionally lift less than ten pounds, could stand or walk for less than two hours in a workday, could sit for eight hours in a workday, and that Furister needed medical assistance when performing shopping or doing laundry or housework. (Tr. 745-46). None of the boxes on that form pertain to the use of a walker. As the Commissioner sensibly argues in her brief, Dr. Kudray's opinion was "merely a check-box form, without any indication of the objective medical findings she relied on to find Plaintiff was unable to perform even sedentary work. (Doc. 22 at 14, Tr. 745-46). It is therefore expected that this opinion would have very little detail regarding the limitations experienced by Furister, including little to no explanation of the manner in which her ailments caused her limitations. This is a good reason to discount the weight accorded to Dr. Kudray's opinion, but the brevity and non-specificity of that opinion also renders it an unreliable source for comparing to Furister's alleged need for a walker. Said differently,

23

the ALJ cannot discount Dr. Kudray's opinion because it is too terse to provide reliable evidence, yet also assert that the opinion describes the full extent of Furister's limitation. Likewise, Dr. Reddy's opinion is a single-sentence statement that Furister is "disabled" without any explanation whatsoever, and is thus totally deficient. (Tr. 743).

Because the evidence of record supports Furister's use of a walker, and because the ALJ's RFC finding does not address the need for a walker, I find that the RFC does not properly account for all of Furister's supportable limitations, and therefore the ALJ's decision is not supported by substantial evidence. On remand, the ALJ should assemble an RFC which adequately accounts for all of Furister's supportable ailments.

### 3.    The ALJ Properly Discussed Furister's Non-Severe Impairments

Furister next argues that the ALJ erred by inadequately discussing the limitations posed by her non-severe impairments, including coronary artery disease, myocardial infarction, endometriosis, abdominal pain, hepatitis C, and mental illness. (Doc. 19 at 18-21). The ALJ's RFC must account for all limitations posed by a claimant's ailments, whether those ailments are found to be severe or non-severe at Step Two of the sequential evaluation process. *See* 20 C.F.R. § 404.1545(a)(2). Furister's burden is therefore to demonstrate areas of limitation that the ALJ ignored despite evidence to the contrary.

Furister first argues that the ALJ inadequately accounted for her endometriosis and other abdominal issues; Furister noted that she "underwent several surgeries, and still had difficulties thereafter." (Doc. 19 at 19). The mere diagnosis of an ailment does not establish that any limitations result from that ailment. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th

24

Cir. 1988). The fact that she underwent surgeries is therefore irrelevant unless she demonstrates that the surgeries did not eliminate certain disabling impairments, or that the surgeries caused additional impairments. Furister points to continuing "abdominal pain" in October 2013. (Tr. 648, 653; Doc. 19 at 19). Yet Furister has not provided any evidence that her abdominal pain prevented her from performing any exertional or postural activity, nor that it would have interfered with her ability to concentrate. Furister has thus not demonstrated that this pain would have prevented her from performing work. She also points to a treatment note suggesting that her CT scan results were "worrisome for colitis," yet Furister again fails to point to any evidence that this condition imposed limitations on her ability to work. (*Id.*). Insofar as Furister's surgeries imposed some temporary limitations on account of surgical recovery, that impairment is not of the sort relevant to determining the RFC. *See Vaughn v. Comm'r of Soc. Sec.*, No. 14-CV-12496, 2015 WL 5216165, at *4 (E.D. Mich. Sept. 4, 2015). The ALJ did not fail to account for any limitation imposed by Furister's abdominal pain or possible colitis because there is no evidence that those conditions imposed any limitations at all.

Furister next argues that the ALJ did not properly account for her heart conditions. (Doc. 19 at 20). Furister points to the findings of Dr. DeNardo in September 2013 that she would experience dizziness, fatigue, malaise, chest pain, and shortness of breath. (Tr. 537). Dr. DeNardo appears to be addressing Furister's recovery from abdominal surgery, not heart-related issues. Dr. DeNardo stated in the "chief complaint" section that Furister was "here for three month follow up . . . [she] is status post several abdominal surgical

25

procedures. She is recovering slowly. She encountered no cardiovascular difficulties during the course of these surgical procedures." (Tr. 537). An EKG was performed to test Furister's heartbeat, suggesting that Furister's heart condition was being actively monitored, but the record contains no finding suggesting that she was experiencing a heart condition or any limitations attendant to such a condition. (Tr. 537-38).

In February 2014 Furister returned to Dr. DeNardo for another "three months follow up," apparently following another surgery. (Tr. 712). Dr. DeNardo wrote in the "chief complaint" section that Furister had begun smoking again, that she was in "no chest discomfort," but that further testing should be performed given her "history of stent placement." (Tr. 712). His "impression" was of dizziness, malaise and fatigue, muscle weakness, shortness of breath, and chest pain, consistent with her "past medical history." (Tr. 712-13).

Dr. DeNardo's notes are of questionable usefulness. First, it is not clear from Dr. DeNardo's findings whether Furister was experiencing symptoms as the result of surgical recovery or some other cause. Second, Dr. DeNardo noted in both the 2013 and 2014 visits that Furister was not experiencing heart difficulties. Third, Dr. DeNardo's February 2014 notes appear to be self-contradictory, where he finds that Furister was not experiencing "chest discomfort," yet wrote of "chest pain" in his "impression" section. (Tr. 712-13). Particularly when read in context with other cardiology testing, which seems to indicate that Furister did not experience significant heart trouble between mid-2012 and mid-2014, Dr. DeNardo's findings do not appear to confirm the existence of significant heart-related

26

limitations. *See* July 2012, no further chest discomfort after quitting Spiriva, and no evidence of ischemia (Tr. 393); June 2012, EKG normal (Tr. 347-48, 356); November 2013, EKG normal (Tr. 717-18); April 2014, EKG normal (Tr. 709-11). This is not to say that Furister's heart was in top condition; on the contrary she clearly suffered from heart disease, including coronary artery disease and left ventricular dysfunction. (*See, e.g.*, Tr. 387). In February 2014 Furister was noted to experience "no chest pain, no shortness of breath and no jaw pain," but Dr. Kudray noted that walking, stress, and exercise exacerbated her heart condition. (Tr. 720). Yet the record does not reveal any significant limitation imposed by Furister's heart disease, and Furister has not provided any reason to believe that she would be unable to perform sedentary work as a consequence of her heart condition.

Finally, and quite briefly, Furister asserts that she also experienced difficulty concentrating, fatigue, insomnia, and panic attacks as the result of her "then newly-diagnosed anxiety issues." (Doc. 19 at 20). Furister points to a single record, drafted in February 2014 by D.O. Kudray, that she experienced anxiety disorder without depression. (Tr. 720). As with her heart condition, Furister has not pointed to any evidence that her anxiety caused any limitation on her ability to perform work.

### H.    Conclusion

In sum, the ALJ adequately addressed the opinion of Dr. Kudray, and adequately discussed Furister's non-severe impairments, but did not properly account for Furister's

well-supported use of a walker in the RFC. As a result, the ALJ's decision is not supported by substantial evidence, and should be remanded for further proceedings.

## I.    Order

For the reasons stated above, **IT IS ORDERED** that Furister's Motion for Summary Judgment (Doc. 19) is **GRANTED**, the Commissioner's Motion (Doc. 22) is **DENIED**, and this case is **REMANDED for further proceedings under Sentence Four of 42 U.S.C. § 405(g)**.

**IT IS SO ORDERED**.

Date:  February 8, 2017                S/ PATRICIA T. MORRIS
                                       Patricia T. Morris
                                       United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: February 8, 2017                   By s/Kristen Castaneda
                                         Case Manager